Filed 4/3/13  P. v. Flores CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JESSE ANTHONY FLORES,<br><br>    Defendant and Appellant. | H037031<br>(Monterey County<br>Super. Ct. No. SS102699) |

Defendant Jesse Anthony Flores was convicted by jury trial of carrying a loaded firearm on his person in a public place (former Pen. Code, § 12031, subd. (a)(1)),[1] having a concealed firearm on his person (former § 12025, subd. (a)(2)), possessing a firearm in violation of a probation condition (former § 12021, subd. (d)(1)), and active participation in a criminal street gang (§ 186.22, subd. (a)).  The jury also found true gang allegations (§ 186.22, subd. (b)(1)) attached to the carrying and concealed firearm counts.  The court found true allegations in connection with the carrying and concealed firearm counts that defendant was prohibited by a probation condition from possessing a firearm (former §§ 12025, subd. (b)(4), 12031, subd. (a)(2)(D)) and that he was not the registered owner of the firearm (former §§ 12025, subd. (b)(6), 12031, subd. (a)(2)(F)).  Defendant was committed to state prison for a four-year term.

---

[1]     Subsequent statutory references are to the Penal Code unless otherwise specified.

On appeal, he contends that (1) the active participation in a criminal street gang count (the gang count), the gang enhancements, and the former section 12021 count are not supported by substantial evidence, (2) the court violated his constitutional rights by admitting into evidence statements he made during booking without finding that the statements were voluntary, (3) the instructions on the gang count erroneously failed to advise the jury that it required specific intent, (4) the jury was misinstructed on the specific intent element of the gang allegations, (5) the court gave an inadequate limiting instruction on hearsay evidence relied on by the gang expert, (6) his trial counsel was prejudicially deficient in failing to object to the admission of prejudicial and irrelevant evidence, and (7) these errors were cumulatively prejudicial.  Defendant also asserts that the concurrent term imposed for the gang count should have been stayed under section 654, that he should have been granted additional presentence conduct credit under a revised version of section 4019 that took effect after he was sentenced, and that the restitution fines were erroneously imposed.[2]  We conclude that the gang count and the former section 12021 count are not suppported by substantial evidence.  We also find that a remand is required with respect to the restitution fines.  Consequently, we reverse the judgment.

## I.  Factual Background

On December 8, 2010, Salinas Police Officer Scott Sutton was informed at that day's "briefing" that defendant was "a person that may be wanted" by the police.  While he was on patrol at about 4:10 p.m. that afternoon, Sutton saw defendant about to enter the gate to a large apartment complex and pulled his patrol car over about 100 feet in front of defendant.  The area surrounding this apartment complex was a "stronghold for

---

[2] Defendant also filed a petition for a writ of habeas corpus, which we dispose of by separate order.

the Norteno gang in Salinas," and the "vast majority" of Salinas Nortenos reside in this area. There had been "a significant amount of violence" in this area, including "shootings" and "robberies."

As no backup units were available, Sutton decided to make casual contact with defendant to confirm his identity. Sutton initiated a conversation by asking defendant if he could talk to him about a car parked on the street. Defendant was "nervous" and "fidgety," and, when Sutton asked his name, he falsely told Sutton that his name was "Steven Anthony Sotelo."[3] Sutton also asked defendant where he lived, and defendant replied that he lived with his girlfriend in the apartment complex. Defendant gave a nonexistent address for his residence. Defendant asked Sutton if Sutton wanted defendant to find out who owned the car, and Sutton said "that would be great." Defendant walked away into the apartment complex.

Sutton then confirmed defendant's identity (by examining a photograph of him). He also confirmed that there was a warrant out for defendant, that defendant "was on probation with search and seizure," and that defendant "had removed the probation department's ankle bracelet." Less than half an hour after his initial contact with defendant, Sutton saw defendant walking through the apartment complex and called out to him through his car window "Hey." Defendant looked at him and kept walking. Sutton got out of his car and said to defendant: "Hey, I just want to talk to you about the car again." Sutton saw defendant place his forearm against his waistband, a "press check" gesture that Sutton knew a person carrying a weapon often did subconsciously.

By now, Sutton's backup was en route. Defendant agreed to talk to Sutton about the car, and he walked over to Sutton. Sutton asked defendant to have a seat on the

---

[3] The information also alleged that defendant had given false information to a peace officer (§ 148.9, subd. (a)), but this count was dismissed by the prosecution before the case was submitted to the jury.

3

ground, and defendant did so. Defendant again claimed that his name was Sotelo. When the other officer arrived and Sutton went to handcuff defendant, defendant revealed that he had a gun. Sutton asked about the gun's location, and defendant said it was in his pocket. Sutton searched defendant and found the gun in his waistband. The gun had a clip in it with 13 rounds of live ammunition. Sutton arrested defendant and again asked defendant for his name. This time, defendant accurately identified himself.

Defendant was arrested and taken to the police station. Sutton did a "record check" on the gun, and "[t]here was no record" of it. At the station, Sutton advised defendant of his constitutional rights, and defendant acknowledged that he understood his rights. Defendant told Sutton that he had the gun because "[h]e heard a shot being fired at some point, and knows the [C]ity of Salinas is dangerous, and he carries it for his protection." He said he had bought the gun six months earlier from a field worker. Sutton "asked if he knew he's a convicted felon and that precludes him from carrying a weapon or owning a firearm. He stated that he knew." Defendant claimed that he had removed the ankle bracelet "because he had smoked weed, and he knew he was going to be tested by his probation officer." He said he had lied about his name because he "knew there would be a warrant for him for removing the ankle bracelet, and he also had the gun." Defendant told Sutton that he "does not associate anymore" with the Norteno gang. Sutton observed that there were four dots on defendant's elbow. A tattoo with four dots is associated with the Norteno gang.

At the jail, defendant made "a specific housing request," which was "[t]o be placed with the northerners." While in jail awaiting trial, defendant obtained a prominent tattoo of the letter M on his neck. The letter M "stands for Salinas East Market, which is one of the biggest and probably the most powerfull [*sic*] Norteno criminal street gang in the city of Salinas."

## II. Procedural Background

4

Defendant asked that the allegation that he was prohibited by a probation condition from possessing a firearm be bifurcated, and the court granted his request.[4] Only the substantive counts and the gang allegations were submitted to the jury. Defendant waived his right to jury trial on the remaining allegations, and they were tried to the court.[5]

Salinas Police Officer Robert Zuniga testified at trial as the prosecution's gang expert. To establish that the Norteno gang qualified as a criminal street gang, Zuniga described three predicate crimes committed by Norteno gang members. One was committed in March 2009. A loaded revolver was found in a vehicle driven by a Norteno gang member during a traffic stop that prompted a search due to the odor of marijuana. Zuniga stated that the March 2009 crime was committed for the benefit of the Norteno

---

[4] It was not clear whether this bifurcation was intended to include the element of the former section 12021 count.

[5] Immediately after the jury retired to deliberate, the court made the following statement: "Another thing, the parties have entered into a fairly detailed stipulation as to various facts, and I did not read the stipulation to the jurors because we've agreed that a number of these facts pertain to the various allegations that qualify the gun charges in Counts 1 and 2 as felonies, and it's agreed that the Court will make that decision assuming there is a guilty verdict. The Court will make the determination based on the stipulation that, in fact, those additional allegations have been established." Defendant's trial counsel responded: "Correct, your Honor. The defendant gives up his right to a jury trial as to those sentencing enhancements."

After the jury had reached its verdicts, but before it was excused, the following colloquy occurred: "THE COURT: Just as a matter of abundance of caution, I wanted to get a personal waiver from the defendant as to the issue of whether or not he is in the class of persons prohibited from possessing a firearm, and whether that firearm was not registered to him. [¶] MR. DZUBAY [defendant's trial counsel]: Mr. Flores, are you willing to stipulate that the firearm you were caring [sic] was not registered to you? [¶] THE DEFENDANT: Yes. [¶] THE COURT: So you're willing to waive the jury on that issue and have it decided by me? [¶] THE DEFENDANT: Yes. [¶] THE COURT: Defendant waives jury on that issue." Defendant does not challenge the adequacy of this waiver.

5

gang. During a December 2009 traffic stop, a firearm was found concealed on the person of a Norteno gang member. Zuniga opined that the December 2009 crime was also committed for the benefit of the Norteno gang. A September 2010 probation search of a Norteno gang member's house resulted in the discovery of a firearm. Again, Zuniga opined that the crime was committed for the benefit of the Norteno gang.

Zuniga also opined that defendant was an active participant in the Norteno gang at the time of his arrest. Zuniga explained that his opinion was based on the police reports in this case, defendant's tattoos, his "housing request" and "housing at the jail," and "prior contacts with [defendant] that are documented in the Salinas Police Department records, as well as the current offense." Zuniga described three prior police contacts with defendant. In September 2008, defendant was in a car with four Norteno gang members when the car was stopped by the police. A firearm and gang indicia were found in the car. In November 2008, police responding to a trespassing complaint made contact with three Norteno gang members and defendant at a "known Norteno hangout." Defendant provided the police with a false name on that occasion. In November 2010, a probation search of defendant's residence turned up several items of gang indicia, one of which was specifically associated with the Salinas East Market subset of the Norteno gang. Defendant was arrested for violating his juvenile probation. He was released from custody on November 8, 2010, just a month before the current offense.

Zuniga testified that defendant's possession of the firearm "does promote and it does further the Norteno criminal street gang" because "[a] gun is a tool of the trade for Norteno gang members" and "should the opportunity arise where a Norteno gang member who is possessing a firearm has the ability to commit a crime, such as a shooting or a robbery, they have that tool readily accessible to use." The firearm is also available for protection purposes if the gang member is approached by a member of a rival gang. "That enhances that individual's reputation to carry a firearm. It also enhances the gang's reputation for that particular individual to be carrying a firearm. It shows how

6

dangerous these gang members can be." This causes intimidation and fear. For similar reasons, Zuniga testified, defendant's possession of the firearm benefitted the gang because the firearm was "readily accessible should the opportunity arise to commit a crime."

Defendant's trial counsel did not argue to the jury that defendant was not guilty of the three firearm counts. He argued only that the prosecution had failed to prove the gang count and the gang allegations. The jury returned guilty verdicts on the four substantive counts and found the gang allegations true. The court found the remaining allegations true. It imposed a two-year prison term for the carrying a loaded firearm count and a consecutive two-year term for the gang allegation attached to that count.[6] It imposed a concurrent term for the gang count. For the other two counts, the court imposed and stayed terms under section 654. The remaining enhancements were ordered stricken under section 1385. Defendant timely filed a notice of appeal.

### III. Discussion

### A. Substantial Evidence Challenges

Our standard of review is well established. " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576, quoting *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319.) "[The] appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People* v. *Reilly* (1970) 3

---

[6] The court did so after first sending defendant for a diagnostic evaluation by the Department of Corrections and Rehabilitation. The diagnostic study recommended a prison term.

Cal.3d 421, 425; accord *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1237.) "A reasonable inference, however, 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.'" (*People* v. *Morris* (1988) 46 Cal.3d 1, 21.) A trier of fact may rely on inferences to support a conviction only if those inferences are "of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt" that the inferred facts are true. (*People* v. *Raley* (1992) 2 Cal.4th 870, 890-891.) "Evidence is sufficient to support a conviction only if it is substantial, that is, if it '"reasonably inspires confidence"' and is [citation], 'credible and of solid value.' [Citation.]" (*Id.* at p. 891.)

## 1. Gang Count

Defendant contends that the jury's verdict on the gang count is not supported by substantial evidence because he acted alone in committing the offense, and therefore did not promote, further, or assist any other gang member in his commission of the underlying criminal conduct. This precise issue was recently resolved by the California Supreme Court in *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*). A gang member acting alone does not violate section 186.22, subdivision (a). The Attorney General concedes that *Rodriguez* supports defendant's contention. Hence, defendant's conviction on the gang count cannot be upheld due to insufficiency of the evidence.

## 2. Gang Enhancements

Defendant challenges the sufficiency of the evidence to support the specific intent element of the gang enhancement allegations.

### a. Background

Counsel agreed during in limine motions that the gang expert "should not be allowed to testify as to what [defendant's] intent was at that time," and the court so ordered. On direct examination, the prosecutor asked Zuniga: "Now, if an individual is a

8

gang member and carrying a firearm, what is your opinion as to whether or not that person, individual, is car[r]ying that firearm their intent to assist, further, or promote criminal conduct by the gang?" Zuniga replied: "It's my opinion that they're furthering and promoting the Norteno criminal street gang." Defendant's trial counsel did not interpose any objection. Zuniga went on to testify that, by possessing a firearm, "they're furthering the gang's reputation to be violent" and benefitting the gang by enabling the individual "to commit crimes should the opportunity [arise]." Again, defendant's trial counsel interposed no objection.

### b. Analysis

Defendant contends that Zuniga's testimony regarding the specific intent element was insufficient to support the jury's finding because his opinion was not based on an adequate factual foundation but was instead merely speculation.

Defendant relies on a series of cases, all of which relied at least in part on the Fifth District Court of Appeal's decision in *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), disapproved in part in *People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn. 3 (*Vang*).[7] *Killebrew* did not involve a gang enhancement allegation. Killebrew was convicted of conspiring to possess a handgun even though he had not been seen anywhere near the handgun. (*Killebrew*, at pp. 647-650.) The prosecution's theory was that Killebrew had been in a vehicle that was travelling with other vehicles and that someone in these vehicles possessed a handgun. An expert was permitted to testify that "when one gang member in a car possesses a gun, every other gang member in the car knows of the gun and will constructively possess the gun." (*Killebrew*, at p. 652.) Killebrew claimed on appeal that testimony about the "subjective knowledge and intent of each occupant in

---

[7] Defendant's reliance on *People v. Albarran* (2007) 149 Cal.App.4th 214 is misplaced, as that case did not concern the sufficiency of the evidence to support gang enhancement allegations (which were dismissed), but the admissibility of gang evidence.

9

the car" should not have been admitted. (*Ibid*.) The Fifth District agreed. It opined that no prior case "permitted testimony that a specific individual had specific knowledge or possessed a specific intent," although the court acknowledged that a court had previously upheld the admission of similar opinion testimony "framed in terms of gangs in general, not a specific defendant's subjective expectation." (*Killebrew*, at p. 658.) Because the expert in *Killebrew* had, in the Fifth District's view, explicitly testified that specific individuals "knew" of the presence of the guns and "jointly possessed" them, his testimony was "an improper opinion on the ultimate issue and should have been excluded."[8] (*Killebrew*, at p. 658.)

*In re Frank S.* (2006) 141 Cal.App.4th 1192 (*Frank S.*), like the case before us and unlike *Killebrew*, concerned the sufficiency of the evidence to support the specific intent element of a gang enhancement allegation. Frank was stopped by police after he ran a red light on his bicycle. He gave a false name, and the officer found a concealed knife, a bindle of methamphetamine, and a red bandana in Frank's possession. (*Frank S.*, at p. 1195.) Frank admitted that he carried the knife to protect himself against " 'Southerners,' " as he was allied with northern street gangs. (*Frank S.*, at p. 1195.) The gang expert was permitted to testify that Frank had possessed the knife to protect himself, and she opined that gang members use knives to protect themselves from rival gang members and to assault rival gang members. (*Frank S.*, at pp. 1195-1196.) On appeal, Frank challenged the sufficiency of the evidence to support the specific intent element of the gang enhancement. (*Frank S.*, at p. 1196.) Relying on *Killebrew*, the Fifth District concluded that the expert should not have been permitted to testify "that a specific

---

[8]     The holding in *Killebrew* was subsequently limited by the California Supreme Court's decision in *Vang*, *supra*, 52 Cal.4th 1038. In *Vang*, the court held that an expert *may* offer an opinion regarding intent in support of a gang enhancement allegation so long as the expert's response to a *hypothetical* question regarding intent is based on the facts of the case. (*Vang*, at p. 1046.)

individual possessed a specific intent." (*Frank S.*, at p. 1197.)  As the expert's testimony was, in the Fifth District's view, "the only evidence" of Frank's intent, the true finding on the enhancement allegation was not supported by substantial evidence.  (*Frank S.*, at pp. 1197-1199.)

*People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*), like *Frank S.*, was a Fifth District case concerning the sufficiency of the evidence to support the specific intent element of gang enhancement allegations.  Ramon, a gang member, was stopped by police in his gang's territory while driving a stolen truck.  A fellow gang member was his passenger, and an unregistered firearm was found under the driver's seat.  (*Ramon*, at pp. 846-847, 849.)  The prosecution's gang expert testified at trial that the stolen truck and the unregistered firearm could be used to commit gang crimes.  (*Ramon*, at p. 847.)  He offered an opinion that possession of a gun and driving of a stolen truck in gang territory therefore benefitted the gang and that the perpetrators of these offenses would intend to promote the gang.  (*Ramon*, at p. 848.)  The expert testified that stolen trucks and firearms were "tools" that the gang needed to commit other crimes.  (*Ibid*.)

Ramon argued on appeal that the facts of his offenses plus the fact of his gang membership and presence in gang territory were insufficient to support the expert's opinion on benefit and intent.  (*Ramon*, *supra*, 175 Cal.App.4th at pp. 849-850.)  The Fifth District, relying on *Killebrew* and *Frank S.*, agreed.  (*Ramon*, at p. 851.)  "These facts, standing alone, are not adequate to establish that Ramon committed the crime with the specific intent to promote, further, or assist criminal conduct by gang members. While Ramon may have been acting with this specific intent, there is nothing in the record that would permit the People's expert to reach this conclusion."  (*Ibid*.)  "The facts on which [the gang expert] based his testimony were insufficient to permit him to construct an opinion about Ramon's specific intent in this case.  His opinion, therefore, cannot constitute substantial evidence to support the jury's finding on the gang enhancement."  (*Ramon*, at p. 852.)  "While the People's expert's opinion certainly was

11

one possibility, it was not the only possibility. And, as stated *ante*, a mere possibility is not sufficient to support a verdict." (*Ramon*, at p. 853.)

*People v. Ochoa* (2009) 179 Cal.App.4th 650 (*Ochoa*) was a Fourth District Court of Appeal case in which Ochoa challenged the sufficiency of the evidence to support the gang benefit element of the gang enhancement allegations attached to carjacking and felon in possession of a firearm counts. (*Ochoa*, at p. 652.) Ochoa, a gang member, had acted alone in committing a carjacking with a shotgun. (*Ochoa*, at p. 653.) The offense had not occurred in Ochoa's gang's territory. (*Ochoa*, at p. 662.) A divided Fourth District found the evidence insufficient to sustain the benefit element of the gang enhancements. "[N]othing in the circumstances of the instant offenses sustain[s] the expert witness's inference that they were gang related." (*Ochoa*, at pp. 661-662.) "[The gang expert's testimony] was based solely on speculation, not evidence. An appellate court cannot affirm a conviction based on speculation, conjecture, guesswork, or supposition." (*Ochoa*, at p. 663.) On the other hand, the *Ochoa* court disagreed with the *Ramon* court's assessment of the evidence in *Ramon* and said that it would have found that evidence sufficient to support the specific intent element. (*Ochoa*, at p. 661, fn. 6.)

*In re Daniel C.* (2011) 195 Cal.App.4th 1350 (*Daniel C.*) was a First District Court of Appeal case in which Daniel challenged the sufficiency of the evidence to support the specific intent element of the gang enhancement allegation. Daniel and three other young men, all wearing red, went into a store. Two of Daniel's companions were gang members, and he was an "affiliate." After his companions left the store, Daniel took a bottle of liquor and left without paying for it. A store employee confronted him, and Daniel broke the bottle and attacked the employee with the broken bottle. He then escaped in a vehicle with the other young men. (*Daniel C.*, at pp. 1353-1355, 1362.) A gang expert testified that the robbery was "gang-related" based on gang membership, the coordinated actions of the young men, the fact that they were wearing red, and the fact that crow bars and a baseball bat were found in the vehicle. (*Daniel C.*, at p. 1356.) The

First District found the evidence insufficient to support the specific intent element of the gang enhancement allegation because there was no evidence that defendant had acted "in concert" with his companions. Consequently, as Daniel was not himself a gang member, he could not have intended to assist "gang members" in committing the robbery (which the First District concluded he perpetrated alone), and the specific intent element therefore lacked evidentiary support. (*Daniel C.*, at pp. 1361-1362.)

The Attorney General acknowledges these cases but claims that they are all distinguishable. It is true that almost all of these cases may be distinguished from the case before us.[9] *Killebrew* had nothing to do with gang enhancement allegations and was founded on the inadmissibility of evidence rather than the insufficiency of the evidence. The opinion in *Frank S.*, which relied heavily on *Killebrew*, also seemed to turn on the alleged inadmissibility of the expert's testimony due to the expert inappropriately testifying about Frank's intent rather than in response to a hypothetical. *Ochoa* did not concern the specific intent element, but the gang benefit element. The holding in *Daniel C.* was based on the court's finding that Daniel was not a gang member and therefore, because it found that he acted alone, could not have intended to assist gang members.

Although the Attorney General attempts to distinguish *Ramon*, this attempt is not entirely successful. Unlike in *Ramon*, Zuniga testified that possession of firearms was

---

[9] Both the Attorney General and defendant, and some courts, make the mistake of using the term "gang-related" as a shorthand reference to the specific intent requirement. The gang enhancement's specific intent requirement does not require that the offense itself be "gang-related." (*People v. Albillar* (2010) 51 Cal.4th 47, 55-56.) If the defendant committed the offense with the intent to promote criminal activity by gang *members*, not the gang, the specific intent element is satisfied. The gang *benefit* element, which is separate from the specific intent element, requires that the offense be committed for the benefit of, in association with, or at the direction *of the gang*. The gang benefit element, but not the specific intent element, could properly be referred to as a "gang-related" requirement. The imprecision of the "gang-related" reference interferes with attempts to evaluate the sufficiency of the evidence to support the specific intent element. We avoid this misnomer in our analysis.

13

among the Norteno gang's primary activities. While there was no such evidence in *Ramon*, and the *Ramon* court mentioned that it might have made a difference, the other evidence of intent in *Ramon*, which the court found insufficient, was far stronger than it is in this case. Ramon committed his offenses in the company of a fellow gang member, which raised significant inferences in favor of finding the specific intent element true that are not present here. Evidence that it is a primary activity of the Norteno gang to possess firearms does not *by itself* provide significant support for an inference that defendant's solo possession of a firearm was actually intended to promote, further, or assist in criminal activity by gang members.

Nevertheless, we are not persuaded that the evidence in this case was insufficient to support the jury's finding on the specific intent element. "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) We do not agree with defendant that the only facts supporting specific intent were his gang membership and the fact that the offense was committed in his gang's territory. First, it was significant that the area where defendant committed this offense was not just gang territory but also known for shootings and robberies, both of which may be substantially promoted, furthered, and assisted by possession of a firearm. Second, defendant admitted that he had had the gun for six months for "protection." Given his gang membership, defendant's intent to use the gun for "protection" implied his involvement with fellow gang members in criminal activity that would prompt such a need. Third, defendant admitted removing his ankle bracelet, knowing a warrant would be out for his arrest as a result, and knowing that he was precluded from possessing a firearm. This concurrence of circumstances strongly suggested that his firearm possession was not for merely personal "protection" use but was intended to further some greater end that would justify the heightened risks he knew he was taking. While Zuniga's highly generalized (and somewhat ambiguous) opinion testimony *alone* might

14

well not be sufficient to support the jury's true finding on the specific intent element, as suggested by the cases on which defendant relies, the totality of the circumstantial evidence of defendant's intent was not so lacking in substantiality that it could not support the jury's finding. We reject defendant's challenge.

### 3. Former Section 12021 Count

Defendant contends that the former section 12021 count cannot be upheld because the prosecution produced no evidence that his possession of a firearm was "[p]rohibited by an [e]xpress [c]ondition of [p]robation." (Boldface omitted.)

Defendant was charged with violating former section 12021, subdivision (d)(1). "Any person who, *as an express condition of probation*, is prohibited or restricted from owning, possessing, controlling, receiving, or purchasing a firearm and who owns, purchases, receives, or has in his or her possession or under his or her custody or control, any firearm but who is not subject to subdivision (a) or (c) is guilty of a public offense . . . ." (Former § 12021, subd. (d)(1), italics added.) Although evidence was presented at trial that defendant was on juvenile probation at the time of the current offense, there was no mention of the conditions of his probation other than the search condition. The prosecution and the defense entered into a written stipulation that "[a] court had previously ordered [defendant] not to possess firearms." The stipulation said nothing about any probation conditions. The jury was instructed that it was an element of this count that "a Court has ordered the defendant not to possess a firearm." This instruction also told the jury that "[t]he defendant and the People have stipulated or agreed that the Court ordered the defendant not to possess a firearm. This stipulation means that you must accept this fact as proved. Do not consider this fact for any other purpose. Do not speculate about why the Court's order was made."

The Attorney General's very brief response to this contention is that "[t]he jury could readily infer from this evidence [(that is, evidence that defendant was on probation with a search condition)] that the prior court order [mentioned in the stipulation] was a

15

probation condition." The Attorney General's chain of reasoning assumes that the jury engaged in unsupported speculation, rather than that it drew reasonable inferences from the evidence. The record provides no foundation whatsoever for such an inference. The stipulation contained no reference to probation or probation conditions, and no evidence was before the jury to suggest that the *probation search condition* was in any way related to the court's *order* that defendant was "not to possess a firearm." The prosecution simply failed to supply a necessary element of proof. Consequently, we agree with defendant that the former section 12021 count cannot be upheld due to the lack of substantial evidence.

## B. Booking Statements

Defendant contends that the trial court erred in denying his request for an Evidence Code section 402 hearing on the admissibility of statements he made during booking on four separate occasions and in admitting those statements over his objection.

### 1. Background

The prosecution's exhibit list, filed at the commencement of trial, specified that it intended to introduce "Jail housing documents."[10] Defendant made an in limine motion seeking to exclude evidence of defendant's statements "to the [J]ailer" unless the prosecution established at an Evidence Code section 402 hearing that the "questioning did not violate Miranda and was within the exception noted in People v. Gomez

---

[10] During in limine motions, the defense asserted that evidence of where the jailers actually housed defendant was "irrelevant." When it was explained that the prosecution was actually seeking to show that defendant had not been attacked by his fellow prisoners, the defense asked only that "adequate foundation be laid before that comes in."

16

[citation]."[11]  The defense characterized what it sought as "a 402 voluntariness hearing" to determine whether the jailer was aware of "what [defendant] was in on."  The prosecution asserted that there was no need for such a hearing because "every single person who comes into the jail goes through the same booking process" and is asked "the same questions" so that housing determinations can be made.  The court concluded that no hearing was necessary because it was irrelevant whether the jailer knew of the charges, since the same questions would have been asked in any case.

Defendant's trial counsel thereafter stipulated to the admission of the four "intake screening questionnaire[s]" without foundational testimony.  He agreed that he would prefer to "cross-examine the experts" with respect to these documents rather than "calling the specific deputy that took the statements."  Zuniga therefore testified about the four questionnaires, which were admitted into evidence.

Four forms entitled "CLASSIFICATION INMATE INTAKE SCREENING QUESTIONNAIRE" were admitted into evidence.  These form questionnaires were dated December 8, 2010, November 13, 2010, August 3, 2010, and July 26, 2010.  Each form consisted of preprinted questions that were to be answered primarily by circling "Y" or "N."  Some questions were followed by blanks where the requested information was to be recorded.  Each form was signed by defendant and a sheriff's deputy.

The upper section of the form was preceded by the instruction "**Ask the inmate the following**:"  This was followed by about 20 questions.  Two of these questions explicitly concerned gangs.  The question "Have you or any family member ever been associated with a gang?" was followed by "(I)nmate / (F)amily / (N)o."  The question "If so, what gang, and what was the status in the gang and length of time?" was followed by

---

[11]  Defendant also sought an in limine ruling precluding, on Sixth Amendment grounds, "any testimonial hearsay evidence coming into evidence through any [expert] witness" as the basis for the expert's opinion.

17

a blank to be filled in with the information. The lower section of the form was preceded by the instruction: "**Deputy to answer**:" This was followed by about a dozen questions, including "Are the charges violent?," "Officer's observation for housing?," "Scars / Marks / Tattoos? List all:," and "Clothing."

On the upper section of the December 2010 form, "(I)nmate" was circled after the question about gang association, and the deputy had recorded defendant's response to the question about the identity of the gang as "stated, 'I associate w/Nor.'" It also recorded that defendant said he had previously been housed in "K-POD," would like to be housed in "(G).P.," was on probation, and had no enemies.[12] On the lower section of the December form, the deputy had responded "Y" to the question "Are the charges violent?" and had written in "WEAPONS" next to that question. The deputy's response regarding housing was "(G).P."[13] The deputy had also recorded that defendant had "4-DOTS" on his left elbow and that his clothing was a black and white jacket, a black shirt, black pants, and white shoes.

The November 2010 form reported that defendant identified his gang association as "Salinas," said that he wanted to be housed in "K-POD," and reported that his enemies were "Surenos." His clothing was identified as black and brown, and the deputy reported no tattoos.[14]

The August 2010 form reported that defendant said he "associates" "w/nortenos," and wanted to be housed "w/nortenos," and his "enemies" were "Surenos."[15] None of his clothing was red.

---

[12] Apparently "G.P." refers to general population.

[13] An attachment to the December form recorded that defendant had actually been housed in K-POD on December 9, 2010.

[14] An attachment recorded that defendant was housed in K-POD.

[15] Defendant was apparently booked and released.

18

The July 2010 form similarly reported that defendant had identified his gang association as "NORTENO ASSOCIATE" and asked to be housed in "(G).P." The deputy reported on the July form that defendant had no tattoos and was wearing all black clothing.

Zuniga testified that someone who is not a gang member would not be permitted by the other gang members to remain housed in a gang "pod" at the jail. The other gang members would tell the person to leave or assault the person to cause the person's removal.

During trial, the defense renewed its objection to the admission of the booking questionnaires without a voluntariness inquiry. The questionnaires were admitted into evidence over this objection. In his closing argument, defendant's trial counsel expressly invited the jury to look at the "booking sheet" in support of his argument that defendant was not wearing any gang clothing at the time of his arrest and that he was wearing a jacket that would have concealed his four dots tattoo. He also asked the jury to examine the booking questionnaires on other issues.

The trial court instructed the jury with CALCRIM No. 358: "You have heard that the defendant made oral statements before the trial. You must decide whether the defendant made any of these statements in whole or in part. If you decide that the defendant made such statements, consider the statements along with the other evidence in reaching your verdict. It is up to you to decide how much importance to give to the statements. Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."

Shortly after giving CALCRIM No. 358, the court also gave CALCRIM No. 360. "Officer Zuniga testified [that] in reaching his conclusions as an expert witness, he considered statements made by jail classification deputies. You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true."

19

## 2. Analysis

Defendant seems to be making both procedural and substantive contentions. He claims that the trial court erred in failing to hold the requested hearing, and he asserts that the trial court erred in admitting the evidence because the prosecution failed to establish that he had waived his Fifth Amendment rights and voluntarily responded to the deputies' questions.

We can find no merit in his procedural contention. "[I]n a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests." (Evid. Code, § 402, subd. (b).) This statute applies "[w]hen the existence of a preliminary fact is disputed." (Evid. Code, § 402, subd. (a).) It is designed to prevent evidence from being disclosed to the jury prior to a ruling on its admissibility. Here, the trial court correctly "hear[d] and determine[d]" the admissibility of defendant's statements outside the presence of the jury as requested by defendant. While no *evidentiary* hearing was held on this issue, the statute does not explicitly require that such a hearing be held. Here, the trial court plainly concluded that there were no material factual disputes as to any preliminary facts.

Defendant's substantive contention also lacks merit. Below, relying on *People v. Gomez* (2011) 192 Cal.App.4th 609 (*Gomez*), defendant contended that the statements were inadmissible in the absence of proof of two preliminary facts: (1) the statements were "voluntar[y]"; and (2) the deputies who filled out the forms were not aware of the charges against defendant when they did so.

In *Gomez*, the Fourth District stated that "whether a question about a suspect's gang affiliation during a booking interview is encompassed by the booking question exception depends upon whether, under all the facts and circumstances, the question was designed to elicit an incriminating response." (*Gomez, supra*, 192 Cal.App.4th at p. 627.) "In determining whether a question is within the booking question exception, courts

20

should carefully scrutinize the facts surrounding the encounter to determine whether the questions are legitimate booking questions or a pretext for eliciting incriminating information. [Citation.] Courts have considered several factors, including the nature of the questions, such as whether they seek merely identifying data necessary for booking [citations]; the context of the interrogation, such as whether the questions were asked during a noninvestigative, clerical booking process and pursuant to a standard booking form or questionnaire [citations]; the knowledge and intent of the government agent asking the questions [citations]; the relationship between the question asked and the crime the defendant was suspected of committing [citations]; and any other indications that the questions were designed, at least in part, to elicit incriminating evidence and merely asked under the guise or pretext of seeking routine biographical information [citations]." (*Gomez*, at pp. 630-631.)

We review the trial court's ruling under a primarily deferential standard of review. "'"[W]e accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." [Citation.]'" (*Gomez*, *supra*, 192 Cal.App.4th at p. 627.) The forms themselves were substantial evidence supporting the trial court's decision. The trial court could reasonably conclude from the forms themselves that the two standardized questions regarding gang associations were routine inquiries for the purpose of making appropriate jail housing assignments. Defendant was asked: (1) "Have you or any family member ever been associated with a gang?"; and (2) "If so, what gang, and what was the status in the gang and length of time?" The fact that these questions appeared on standardized forms clearly used for every person booked into the jail and that they were plainly essential to the purpose of obtaining vital information necessary to ensure the safety of jail inmates eliminated any possibility that the questions were pretextual or designed for an investigative purpose. As the trial court recognized,

the subjective state of mind of the deputy asking these necessary, standardized questions was therefore irrelevant.  The trial court did not err in admitting into evidence defendant's answers to these questions.

### C.  Instructional Error Assertions

Defendant claims that the court made three instructional errors.  The first of these alleged errors concerns the gang count, which we have already determined must be reversed due to insufficiency of the evidence.  We therefore need not address that contention.  Defendant's remaining claims of instructional error concern the instructions on the gang enhancement allegations and the court's limiting instruction.

### 1.  Gang Enhancements

Defendant contends that the trial court gave conflicting instructions on the specific intent element of the gang allegations.

When the court initially instructed the jury as to which counts and allegations required specific intent and which required general intent, the court told the jury that each of the gang enhancement allegations "requires a specific intent or mental state:  That the crimes charged in Counts 1 and 2 [the carrying and concealed firearm counts] *were committed for the benefit* of a criminal street gang.  For you to find this allegation true, that person must not only intentionally commit the prohibited act, but must [do] so with *a specific intent*.  The act and the specific intent required *are explained in the instruction for that allegation*."  (Italics added.)  When the court thereafter instructed the jury on the gang allegations, it told the jury:  "To prove this allegation, the People must prove that, one, the defendant committed the crime for the benefit of, at the direction of, and in association with a criminal street gang; *and two, the defendant intended to assist, further, or promote criminal conduct by gang members*."  (Italics added.)

When a criminal defendant challenges the propriety of a jury instruction, we inquire " 'whether there is a reasonable likelihood that the jury has applied the challenged

22

instruction in a way' that violates the Constitution." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72, quoting *Boyde v. California* (1990) 494 U.S. 370, 380 (*Boyde*).) We evaluate the challenged instruction in the context of all the instructions given by the trial court. (*Boyde,* at p. 378.) We will find error only if it is reasonably likely that the jury misunderstood the law. (*People v. Kelly* (1992) 1 Cal.4th 495, 525-526.)

Here, the trial court's initial instruction identifying the gang allegations as ones requiring a specific intent did not purport to be *itself* an instruction on the nature of the required specific intent. Instead, this instruction, which referred to the gang allegations generally as the allegations that the crimes were "committed for the benefit of a criminal street gang," explicitly told the jury that the required specific intent for these allegations would be "explained in the instruction for that allegation." Consistent with this initial instruction, the required specific intent was thereafter accurately explained in the instruction on the elements of the gang allegations. When the two instructions are considered together, it is clear that it was not reasonably likely that the jury would misunderstand the nature of the specific intent element of the gang allegations. We find no error.

## 2. Limiting Instruction

Defendant complains that the trial court gave an inadequate limiting instruction regarding the hearsay evidence relied on by the gang expert.

### a. Background

The defense made in limine request for a limiting instruction on any hearsay evidence relied upon by a witness to support an opinion. "We request the instruction include advising the jury that hearsay cannot be admitted for its truth, that any facts encompassed in the hearsay must be independently proven by admissible evidence before the facts can be accepted as true or not." A "requested limiting instruction" was attached to the in limine motion. The attached instruction read: "You are about to hear hearsay testimony from this witness about certain events which the witness will rely upon to

arrive at his opinion. None of this hearsay testimony you will hear is proof that the facts stated are true. Any facts contained in the hearsay must be independently proven before you may accept them as true. Otherwise you may use them only in evaluating the witnesses [*sic*] opinion testimony."

At the in limine hearing, defendant's trial counsel asked the court to give a limiting instruction before the expert's testimony about hearsay "that the things they are about to hear are to be received only for the purpose of evaluating the expert's opinion." The court asked if the defense was requesting "CALCRIM 1403," and defendant's trial counsel confirmed as much. The court then said: "The Court grants the motion. I think you're entitled to the instruction. And as far as reading it before the expert testifies, let me take a look at it. I may very well do that."

The trial court did not give a limiting instruction before Zuniga testified, and defendant's trial counsel did not renew his request that it do so. At the conclusion of trial, the court instructed the jury with CALCRIM No. 1403. "You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements charged, or the defendant had a motive to commit the crimes charged. You may also consider this evidence when you evaluate the credibility or believability of a witness, and when you consider the facts and information relied on by an expert witness in reaching his opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is person of bad character, or that he has a disposition to commit crime. [¶] Membership in a gang, by itself, is not unlawful." The court also instructed the jury with CALCRIM No. 332 that it should consider, in evaluating the expert's testimony, "the facts or information on which the expert relied in reach that opinion. [¶] You must decide whether information on which the expert relied was true and accurate. You may disregard any

24

opinion that you find unbelievable, unreasonable, or unsupported by the evidence." Defendant's trial counsel never requested any modification of either of these instructions.

### b. Analysis

Defendant now claims that the trial court's use of CALCRIM No. 1403 did not adequately advise the jury regarding the limited use it was permitted to make of hearsay testified to by Zuniga. Defendant does not claim on appeal that the timing of the instruction was erroneous. Instead, defendant's appellate claim is that the trial court should have modified CALCRIM No. 1403 "to include all of the hearsay 'facts' introduced by the gang expert."

The Attorney General contends that defendant forfeited any challenge to the *adequacy* of the limiting instruction since his trial counsel confirmed to the trial court that his request was for CALCRIM No. 1403, the trial court gave precisely that instruction, and defendant's trial counsel did not request any modification of that instruction. We agree.

A trial court has no obligation to give a sua sponte limiting instruction. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051.) Nor does it have any duty to modify an instruction in the absence of a request. (*People v. Holloway* (2004) 33 Cal.4th 96, 154.) Here, although defendant's trial counsel initially requested a nonstandard limiting instruction, in response to the trial court's inquiry, he confirmed that he was actually requesting CALCRIM No. 1403. And he never requested that this standard instruction be modified in any respect. Consequently, this claim has been forfeited.

Defendant alternatively contends that his trial counsel was prejudicially deficient in failing to preserve this issue for review. The appellate record fails to establish that his trial counsel did not act strategically in choosing to accept CALCRIM No. 1403 as an adequate limiting instruction. (Cf. *People v. Maury* (2003) 30 Cal.4th 342, 394 ["A reasonable attorney may have tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide."].)

25

Zuniga testified about three categories of hearsay: (1) defendant's booking statements, which, as defendant's admissions, were admissible for their truth, and were independently admitted when the questionnaires were admitted into evidence after defendant's trial counsel expressly waived any foundational objections; (2) defendant's prior contacts with the police; and (3) the gang's predicate offenses, documentary evidence of which was also introduced into evidence.

Defendant's trial counsel could reasonably have concluded that there was nothing to be gained in limiting the jury's consideration of defendant's prior police contacts in light of the undisputed nonhearsay evidence that defendant was on probation and had cut off his ankle bracelet. The jury could readily infer from this undisputed nonhearsay evidence that defendant had had some prior contacts with the police. His prior contacts, which consisted of being found with gang members and with gang indicia, had little relevance to anything other than Zuniga's opinion testimony that defendant was a gang member, an issue upon which the jury could properly consider this evidence. As the other two categories of evidence were not introduced solely though Zuniga's testimony, but were before the jury as documentary evidence, the proposed limiting instruction would have been ineffective to restrict the jury's consideration of Zuniga's testimony regarding them. Moreover, defendant's trial counsel could have concluded that it would only confuse the jury to ask it to perform the mental gymnastics that would be required to consider whether this evidence supported Zuniga's opinion without considering its truth. The record before us does not sustain defendant's claim that his trial counsel was deficient in failing to preserve this issue.

### D. Ineffective Assistance of Counsel

Defendant claims that his trial counsel was prejudicially deficient in failing to object to the admission of evidence that defendant: (1) was a "convicted felon," (2) had prior felony arrests, (3) was wanted on a warrant for removing an ankle bracelet, (4) had

26

been mentioned at a police "briefing" as "a person that may be wanted" by the police, (5) was on probation and subject to a search condition, and (6) had committed a current offense that was considered "violent" by a jail deputy.

When a defendant challenges his conviction based on a claim of ineffective assistance of counsel, he must prove that counsel's performance was deficient and that his defense was prejudiced by those deficiencies. (*People v. Ledesma* (1987) 43 Cal.3d 171, 218; *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland*, at p. 687.) "Judicial scrutiny of counsel's performance must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland*, at p. 689.) Thus, whenever counsel's conduct can be reasonably attributed to sound strategy, a reviewing court will presume that the conduct was the result of a competent tactical decision, and defendant must overcome that presumption to establish ineffective assistance. (*Ibid.*)

We see no deficiencies in defendant's trial counsel's failure to object to these snippets of evidence because defendant had *admitted* most of these facts at the time of his arrest, and his admissions were relevant to his state of mind at that time. Defendant admitted to Sutton that he "knew" he was "a convicted felon" who was not allowed to possess a firearm. He also told Sutton that he had removed the ankle bracelet in an attempt to avoid contact with his probation officer. Defendant also said he "knew there would be a warrant for him for removing the ankle bracelet." Since defendant's admissions were properly before the jury as relevant evidence of his state of mind,

27

defendant's trial counsel's decision to forgo objecting to other evidence of these same facts was a reasonable strategic decision.[16] Because the trial court instructed the jury that it could consider "statements made by jail classification deputies . . . only to evaluate the expert's opinion" and could not consider them "as proof that the information contained in the statements is true," defendant's trial counsel reasonably could have decided that there would be no tactical advantage in seeking redaction of the deputy's affirmative response to the question as to whether defendant's offense was "violent," particularly since it was explained by the deputy's having written in "weapon."

## E. Cumulative Prejudice

As there are no errors that could have led to cumulative prejudice, we reject this contention.

## F. Sentencing Error Assertions

### 1. Section 654

Defendant contends that the trial court erred in failing to stay his sentence for the gang count. Since his conviction on that count must be vacated due to insufficiency of the evidence, we need not reach this issue. We note that the California Supreme Court recently decided in *People v. Mesa* (2012) 54 Cal.4th 191 that section 654 precludes punishment for both the gang crime and the underlying felony.

---

[16] Defendant suggests in his reply brief that his admissions should have been excluded as overly prejudicial and not relevant. Since his state of mind was the critical issue at trial, his admissions were highly relevant and not *unduly* prejudicial. His trial counsel could not reasonably expect to succeed in obtaining exclusion of defendant's admissions, so his failure to object was not deficient.

## 2.  Section 4019

Defendant maintains that the trial court should have awarded him additional credit under the amended version of section 4019 that took effect in October 2011.

Defendant's crimes occurred in December 2010.  At his June 2011 sentencing, defendant was given credit for 183 days of actual presentence custody and 91 days of conduct credit.[17]

At the time of defendant's crimes and sentencing, the September 2010 version of section 4019 was in force, and it provided that a defendant would receive two days of conduct credit for every *four* days of actual custody credit.  (Stats. 2010, ch. 426, § 2.)  At that same time, the September 2010 version of section 2933 provided that, "[n]otwithstanding Section 4019 and subject to the limitations of this subdivision," some defendants were eligible for one day of conduct credit for every one day of actual custody credit.  (Stats. 2010, ch. 426, § 1; former § 2933, subd. (e).)  The "limitations" were that "Section 4019, and not this subdivision, shall apply if the prisoner . . . *was committed for a serious felony*, as defined in Section 1192.7, or has a prior conviction for a serious felony, as defined in Section 1192.7, or a violent felony, as defined in Section 667.5." (Stats. 2010, ch. 426, § 1; former § 2933, subd. (e)(3).)

Defendant was ineligible for an award of conduct credit under that version of section 2933, which provided for one-for-one conduct credit, because he was being committed for two serious felonies.  "[A]ny felony offense, which would also constitute a felony violation of Section 186.22" is a serious felony.  (§ 1192.7, subd. (c).)  This includes felony offenses to which gang enhancement allegations are attached.  (*People v. Briceno* (2004) 34 Cal.4th 451, 456.)  Defendant's current carrying and concealed

---

[17]      At the beginning of the sentencing hearing, the probation officer told the court that defendant "is not entitled to custody credits in this case" because he "was being sought as a probation absconder" at the time of his arrest.  The court rejected this argument.

firearm offenses were therefore serious felonies, and the provisions of the September 2010 version of section 2933 were inapplicable to him. Consequently, only the two-for-four conduct credit provision in the September 2010 version of section 4019 was applicable to him.

In April 2011, section 4019 was amended to provide for two days of conduct credit for every *two* days of actual custody. (Stats. 2011, ch. 15, § 482.) However, this amended version explicitly provided that it was prospective only and applied only to crimes committed on or after July 1, 2011. In June 2011, before those prospective provisions took effect, section 4019 was again amended. This version changed the prospective date to October 1, 2011.[18] (Stats. 2011, ch. 39, § 53.) Defendant was sentenced in June 2011. In September 2011, section 2933 was amended. (Stats. 2011, 1st Ex. Sess., 2011-2012, ch. 12, § 16.) The provisions for one day of conduct credit for every day of actual custody credit were deleted along with the limitations attached to that provision, effective October 1, 2011. (Stats. 2011, 1st Ex. Sess., 2011-2012, ch. 12, § 16.)

Defendant argues that the trial court violated his right to equal protection by applying the September 2010 version of section 4019 to him. He contends that even though his crime and all of his presentence custody occurred prior to the October 1, 2011 prospective date upon which conduct credit was increased by the Legislature, he was entitled to have the two-for-two conduct credit scheme applied to him.

Both the federal and state Constitutions guarantee the right to equal protection of the laws. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.) " ' "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." ' '

---

[18] Section 4019 was amended again in September 2011, but this amendment made no relevant changes. (Stats. 2011, 1st Ex. Sess., 2011-2012, ch. 12, § 35.)

[Citation.]"  (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.)  Since the amendments to section 4019 do not involve a "" "" 'suspect classification' "" "" or a "" "" 'fundamental interest,' "" "" courts apply the rational basis test to determine whether the "distinction drawn by the challenged statute bears some rational relationship to a conceivable legitimate state purpose."  (*In re Stinnette* (1979) 94 Cal.App.3d 800, 805.)

Defendant maintains that he is similarly situated to a defendant whose crime was committed after October 1, 2011, and whose custody time occurred after October 1, 2011.  In *People v. Brown* (2012) 54 Cal.4th 314, the California Supreme Court rejected a similar argument with respect to a previous version of section 4019.  It found that prospective only application of the new version of the statute did not violate equal protection because the purpose of the statute was to create an incentive for good behavior, which could not be done retroactively.  The same is true here.  We therefore reject defendant's contention.

### 3.  Restitution Fines

Defendant correctly points out that, at the sentencing hearing, the trial court did not impose mandatory restitution fines.  The minutes signed by the judge state that the restitution fines were $200 multiplied by the number of years of imprisonment and multiplied by the number of felony counts.  The minutes do not calculate the amount or specify the numbers necessary to make the calculation.  The abstract of judgment states that the restitution fines were $3,200 each (four years times $200 times two counts (not subject to section 654)).[19]  The Attorney General concedes that a remand is required to provide the trial court with an opportunity to calculate the appropriate amount of the mandatory restitution fines. We agree.  "An abstract of judgment is not the judgment of

---

[19]     Because we reverse the gang count, the number of counts not subject to section 654 has been reduced to one.  This may impact the court's calculation of the fines.

conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  As the trial court's oral pronouncement did not mention the mandatory fines, the abstract could not simply add the fines.  A remand is required.

## IV.  Disposition

The judgment is reversed and remanded to the trial court with directions to (1) strike the gang count and the former section 12021 count, and (2) impose the mandatory restitution fines.  The trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

_____
Mihara, J.


WE CONCUR:




_____
Bamattre-Manoukian, Acting P. J.




_____
Duffy, J.*


_____

*       Retired Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.